NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0748n.06

No. 12-1637

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 12, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | )   ON APPEAL FROM THE |
| JONATHAN HALE DAVIS, a.k.a. Jo-Nathan Hale Davis, | )   UNITED STATES DISTRICT |
| | )   COURT FOR THE WESTERN |
| | )   DISTRICT OF MICHIGAN |
|    Defendant-Appellant. | ) |

BEFORE: MARTIN and SUTTON, Circuit Judges; ADAMS, District Judge.[*]

ADAMS, J. Jonathan Hale Davis appeals the denial of his motion to suppress and his 324-month sentence. Because there is no error in the denial of the suppression motion and any error in imposing Davis' sentence was harmless, we affirm the district court's judgment.

On August 18, 2011, Davis was indicted on the following charges: 1) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); 2) possession of cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and 3) possession of a firearm in furtherance of a drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(I). On October 24, 2011, Davis moved to suppress the firearm and crack cocaine that was found on his person during his arrest. On December 14, 2011, the district court held a hearing on the motion, receiving

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

testimony from Officer Michael Ferguson and Sergeant Michael Kelley. At the conclusion of the hearing, the court orally denied the motion.

Following the denial of his motion, Davis entered into a conditional plea agreement, preserving his right to challenge the suppression issue on appeal. Thereafter, on May 11, 2012, Davis appeared for his sentencing hearing. During that hearing, Davis objected to his classification as an armed career criminal, arguing that his juvenile conviction for home invasion did not qualify as a predicate offense for that enhancement. The district court rejected Davis' argument and found him to be an armed career criminal. In addition, Davis was found to be a career offender, ultimately resulting in a sentencing range of 262 to 327 months. The district court also acknowledged that it was required to impose the 60 month sentence on count three consecutive to the sentences on counts one and two, effectively resulting in a range of 322 to 387 months. Ultimately, Davis was sentenced to 324 months of incarceration. This appeal followed.

Davis first asserts that the district court erred when it denied his motion to suppress. Davis contends that the district erred when it analyzed his detention utilizing a reasonable suspicion standard rather than a probable cause standard. Further, Davis asserts that the district court should have limited its totality-of-the-circumstances review to activity directly observed by the officers in question, Officer Ferguson and Sergeant Kelly. The Court finds no error in the denial of Davis' motion.

This Court applies a mixed standard of review in evaluating a district court's ruling on a motion to suppress. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010). The district court's findings of fact are reviewed for clear error, while any related conclusions of law are reviewed *de*

*novo*. *Id*. A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). In that vein, due regard must be given to the trial court's opportunity to judge the credibility of the witnesses. *United States v. Blair*, 524 F.3d 740, 749 (6th Cir. 2008).

While Davis has not precisely articulated the contours of his challenge on appeal, it first appears that he asserts error in the legal standard utilized by the district court. In order to evaluate this claim, a review of the facts leading to Davis' ultimate arrest is necessary.

On April 15, 2011, police in Van Buren County, Michigan, learned of a violent home invasion that left the home residents robbed and beaten by armed assailants. The assailants made off with numerous weapons and nearly $16,000 in cash. Through a confidential informant ("CI"), officers received information that three individuals were involved in the home invasion. The CI informed officers that an individual named Billy Crawford, an African American man named Milo, and an African American man known as J.P. were involved in the invasion. The day after the home invasion, Kalamazoo Public Safety Officer Michael Ferguson received a telephone call about the whereabouts of Crawford. Officer Ferguson learned that Crawford was staying at numerous local hotels, having others use their names to rent rooms on his behalf. Officer Ferguson then reached out to Van Buren County Sheriff deputies and learned that they had been able to track Crawford to the Red Roof Inn in Kalamazoo.

Officer Ferguson then made his way to the Red Roof Inn and conferred with the sheriff deputies. Following that meeting, Officer Ferguson departed for a nearby hotel to confirm that Crawford had stayed there on the prior night using a different name. After being unable to locate

Crawford at several other locations, Officer Ferguson was informed that he had been spotted at the Red Roof Inn. In route to the hotel, Officer Ferguson learned that Crawford had been dropped off at the hotel by another individual, later identified as Davis. Officer Ferguson also learned that Davis did not immediately leave the parking lot and appeared to be waiting for Crawford. Shortly thereafter, Davis left the Red Roof Inn parking lot, moving his vehicle to an adjacent Burger King parking lot, still with a full view of the Red Roof Inn. By this time, officers had obtained a search warrant for the hotel room that was being used by Crawford. As officers believed Crawford to be armed and dangerous, they intended to wait for him to depart to detain him and search the room.

Not long after Davis moved the vehicle, Crawford left the hotel room. Davis flashed his lights twice in an apparent effort to signal his location to Crawford. Officers then approached Crawford who began running toward the parked car. Crawford apparently resisted arrest and caused quite a scene in the parking lot. While this arrest was being effectuated, Officer Ferguson approached the parked car on the passenger side with his gun drawn. At the same time, Sergeant Kelly arrived at the driver's side door with his gun drawn. Sergeant Kelly ordered Davis to keep his hands visible and reached in to physically remove him from the vehicle. According to Sergeant Kelly, despite repeated warnings, Davis continued to reach for his waistband once he was removed from the vehicle. As a result, Davis was handcuffed.

Once Davis was handcuffed, Sergeant Kelly asked whether he possessed a weapon and Davis indicated that he had a firearm in his waistband. A pat down confirmed the presence of the firearm and also revealed ten individually-wrapped packages of crack cocaine and a razor blade on Davis'

person. Davis then consented to a search of his vehicle in which officers found a digital scale, pistol holster, and rubber gloves.

Davis first contends that the district court improperly analyzed his initial detention under a reasonable suspicion standard. Davis contends that because officers approached with guns drawn and handcuffed him, he was immediately arrested and therefore a probable cause standard should have been applied. However, this Court's prior precedent makes clear that officers may take such precautions without exceeding the bounds of a *Terry* stop so long as those precautions are warranted by the facts. *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005) (citing *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004); *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir.1999)). "Such reasonable precautions include drawing and displaying weapons, the immediate removal of the occupants from the subject vehicle, and placing the occupants in handcuffs." *Marxen*, 410 F.3d at 332.

The facts herein fully support the precautions utilized by the officers. At the time officers encountered Davis, it was known that he had transported Crawford to the hotel. It was also apparent that Davis was waiting in the area to again transport Crawford. At that time, officers had strong suspicions that Crawford had been involved in a home invasion with two African American males and that all 3 assailants had used firearms in the invasion. Further, when officers went to apprehend Crawford, he ran towards Davis' vehicle. Under those circumstances, officers were fully justified in approaching the vehicle with their guns drawn. Moreover, as Davis repeatedly reached toward his waistband despite orders to stop, the officers were also justified in handcuffing him to preserve

their own safety. None of these activities served to turn a lawful investigatory stop into an unlawful arrest.

To the extent that Davis has asserted that officers lacked reasonable suspicion to initiate the *Terry* stop, the Court finds no merit in such an argument.

This Court's oft-repeated standard for reviewing a *Terry* stop is as follows:

> An investigatory stop of a vehicle is permissible under the Fourth Amendment if supported by reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Since an investigatory stop is less intrusive to one's personal security than an arrest, the level of suspicion necessary for such a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). For purposes of determining whether reasonable suspicion exists, the Supreme Court has instructed that a reviewing court must consider the totality of circumstances to determine whether the detaining officer has a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot. *Id*. at 274–75.
>
> In *Terry*, the Supreme Court focused its discussion on brief investigatory stops made by police officers on the basis of reasonable suspicion not amounting to probable cause for arrest. There, the reasonable suspicion arose from conduct observed by the officer who made the stop. In subsequent cases, however, the Court has clarified that a *Terry* stop is also permissible where the stop relates to a crime already completed and where the information supplying the reasonable suspicion comes from another person rather than the officer's personal observations. *See United States v. Hensley*, 469 U.S. 221, 227 (1985) (holding that an officer has the authority to make a *Terry* stop "when [he] has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity") (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)); *United States v. Cortez*, 449 U.S. 411, 417, n. 2 (1981).

*Marxen*, 410 F.3d at 328-29. Furthermore, officers are permitted to make inferences from and deductions about the total information known to them based upon their specialized training and experience. *Arvizu*, 534 U.S. at 273.

Davis appears to argue that because officers had no substantial evidence that he had been involved in the home invasion, they therefore lacked reasonable suspicion to approach his car. In that light, the Court finds the facts of *Marxen* to be instructive. In *Marxen*, officers initiated a *Terry* stop of Marxen's car following reports of an armed robbery. The stop was initiated because the vehicle matched the make, model, and color of the getaway car used in the robbery. Furthermore, the license plate number matched or nearly matched the number seen by witnesses on the getaway car. However, there was little to no evidence that tied Marxen himself to the robbery. In finding that the stop was appropriate, this Court noted:

> Furthermore, although it is not clear that there was reasonable suspicion to believe that Marxen himself was involved in the robberies, the police had reasonable suspicion to believe that the stop of Marxen's vehicle may produce evidence of a past crime. Under these circumstances, a Terry stop is permissible. *See Hensley*, 469 U.S. at 227–29. In summary, we conclude that police are permitted to conduct a *Terry* stop to investigate completed felonies if they have reasonable suspicion to believe that the vehicle stopped was involved in criminal activity and the stop may produce evidence of a crime even if officers do not have reasonable suspicion to believe that the owner and/or driver of the vehicle was directly involved in the criminal activity.

*Marxen*, 410 F.3d at 332.

Similar to the facts detailed in *Marxen*, police did not have substantial information that linked Davis to the home invasion. However, they did have such information about Crawford. A reliable confidential informant had provided information about Crawford's involvement in the violent home invasion. Moreover, officers had corroborated information that indicated that Crawford was using assumed names at local hotels to avoid detection. Perhaps the most full explanation of the officers' reasonable suspicion was provided by Officer Ferguson himself during the suppression hearing:

>I can list what I have. I had received information that there was a violent home invasion that had taken place in Van Buren County involving multiple weapons. I had also received information that multiple weapons were stolen in the incident, which would lead me to believe that potentially Billy Crawford or his associates could have one of those weapons on their person.
>
>The fact that he had rented a room at two different locations, one at the Knights Inn and then the following night at the Red Roof, which would lead me to believe that he's potentially trying to avoid police detection. I had the information that Mr. -- that the red Pontiac Bonneville was located at the Red Roof Inn earlier that day, but then it's found on North Princeton Street without Mr. Crawford in it, which would lead me to believe that they're attempting to avoid police detection by not driving the same vehicles. The fact that Mr. Crawford was dropped off by Mr. Davis at the motel and that Mr. Davis is waiting for him and then pulls out after potentially being spooked.
>
>And then at that point Mr. Davis pulls into a parking lot which has no other vehicles to the left or to the right of it which has a clear sight or clear path of sight for Mr. Crawford to walk through. We see Mr. Crawford walking through. The fact that officers attempt to stop him and he runs, which would lead a reasonable person to believe that he's trying to get away from something that he's done. And then the fact that he was running towards Mr. Davis's vehicle and also the fact that Mr. Davis flashed his lights as he was coming -- as Mr. Crawford was coming out, and that Mr. Davis maintained on sight and was staring intently at Mr. Crawford as he was being detained in the parking lot, which would lead me to believe potentially he's got evidence of a crime inside of his vehicle, he's involved in the incident or he's involved in some sort of Mr. Crawford's escape or he could be part of the incident that Mr. Crawford was identified as being part of as a suspect in the home invasion.

Officer Ferguson's recitation makes it clear that reasonable suspicion existed to detain Davis. If nothing else, an individual strongly suspected of an armed home invasion sprinted toward Davis' vehicle while being chased by police. That vehicle had not only remained after it had dropped Crawford off at the hotel, but for a wholly unexplained reason had moved to a nearby parking lot while waiting for Crawford. As such, officers had ample reasonable suspicion to believe that the stop of the vehicle "may produce evidence of a past crime" – the home invasion. Accordingly, the district court committed no error in denying the motion to suppress.

Davis next contends that the district court erred in finding that one of his prior state court adjudications was a violent felony under the Armed Career Criminal Act. This issue is subject to a *de novo* review on appeal. *United States v. Bartee*, 529 F.3d 357, 358–59 (6th Cir. 2008).

Under the ACCA, a defendant who violates 18 U.S.C. § 922(g) and has three prior convictions of serious drug offenses or violent felonies must receive a fifteen-year mandatory minimum sentence. *United States v. Johnson*, 675 F.3d 1013, 1016 (6th Cir. 2012) (citing 18 U.S.C. § 924(e)(1)). The ACCA defines "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--
>
> (I) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and
>
> (C) the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

18 U.S.C. § 924(e)(2)(B)-(C). This Court refers to 18 U.S.C. § 924(e)(2)(B)(I) as the "force" prong and the portion of 18 U.S.C. § 924(e)(2)(B)(ii) involving the non-enumerated offenses as the "residual clause."

In *United States v. Wynn*, we explained:

> To determine whether a prior conviction constitutes a "crime of violence," we must apply the categorical approach.... Under this categorical approach, the court must look only to the fact of conviction and the statutory definition—not the facts underlying the offense—to determine whether that definition supports a conclusion that the conviction was for a crime of violence.... There is, however, an exception to

No. 12-1637
*United States v. Davis*

> the categorical approach: When the statutory definition of the prior crime to which the defendant pleaded guilty is ambiguous ... the court may examine ... the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.

579 F.3d 567, 571 (6th Cir. 2009) (quotations and citations omitted).

Offenses that typically qualify under the residual clause are "roughly similar, in kind as well as in degree of risk posed" to the enumerated felonies. *Begay v. United States*, 553 U.S. 137, 143 (2008). The statute's specifically identified offenses involve "purposeful, violent, and aggressive conduct." *Id.* at 144–45. Thus, crimes with "a stringent mens rea requirement" typically qualify if, "as a categorical matter, [they present] a serious potential risk of physical injury to another" in a way "comparable to that posed by its closest analog among the [ACCA's] enumerated offenses." *Sykes v. United States*, 131 S.Ct. 2267, 2273, 2275 (2011) (quoting *James v. United States*, 550 U.S. 192, 203 (2007)). A crime committed by a juvenile (an act of juvenile delinquency) can also constitute a violent felony, but only if, in addition to meeting the qualifications for an adult predicate offense, it also "involv[es] the use or carrying of a firearm, knife, or destructive device." 18 U.S.C. § 924(e)(2)(B).

On appeal, the parties dispute whether Davis' juvenile adjudication for breaking and entering a home is a predicate offense under the ACCA. Davis asserts that the district court improperly combined two juvenile adjudications — one for breaking and entering, the other for stealing a firearm — in order to produce a single offense "involving the use or carrying of a firearm." We need not decide whether Davis's interpretation of the statute is right. Even if it is, we would have to affirm because any error the district court committed was harmless. See Fed.R. Crim.P. 52(a). The

district court sentenced Davis to imprisonment for 324 months, or 27 years—well more than the 15-year mandatory minimum established by the ACCA. This 324-month sentence fits within the range recommended by the Sentencing Guidelines. The district court's insistence on following the guidelines is apparent from its explicit denial of the defense's request for a downward departure. See R. 39 at 413 (THE COURT: "I find I cannot grant [a downward variance] due to the nature of the sentencing structure, due to the nature of the extensive criminal record in this matter."). "Based on the court's express decision to focus on the Guidelines and not the mandatory minimum, it is highly unlikely that a different finding with regard to the mandatory minimum would have affected [Davis's] sentence." *United States v. Mauck*, 469 Fed.Appx. 424, 429 (6th Cir. 2012). Thus, even if the district court was wrong to apply the ACCA's mandatory minimum, its mistake was harmless error. For the foregoing reasons, the district court's judgment is affirmed.

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: August 12, 2013

Mr. Daniel R. Fagan
Daniel R. Fagan & Associates
429 Turner Avenue, N.W.
Grand Rapids, MI 49504

Mr. Russell A. Kavalhuna
U.S. Attorney's Office
P.O. Box 208
Grand Rapids, MI 49501

Mr. Timothy P. VerHey
U.S. Attorney's Office
P.O. Box 208
Grand Rapids, MI 49501

Re: Case No. 12-1637, *USA v. Jonathan Davis*
Originating Case No. : 1:11-cr-00245-1

Dear Sir,

The Court issued the enclosed Opinion today in this case.

Sincerely yours,

s/Louise Schwarber
Case Manager
Direct Dial No. 513-564-7015

cc: Ms. Tracey Cordes

Enclosure

Mandate to issue